UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEENA M. FULLENWIDER, on behalf )
of M.J. and B.J., the minor children of )
Brad Jones, deceased, )
)
    Plaintiff, )
) Cause No. 1:14-cv-360-WTL-DKL
vs. )
)
CAROLYN W. COLVIN, Acting )
Commissioner of the Social Security )
Administration, )
)
    Defendant. )

### ENTRY ON JUDICIAL REVIEW

Plaintiff Deena Fullenwider requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying the applications of Brad Jones[1] for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court rules as follows.

### I. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must

---

[1] After the briefing was completed in this case, Jones' counsel reported that Jones had died. The mother of Jones' minor children, Deena Fullenwider, was substituted as the plaintiff in this case proceeding on behalf of the children.

demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 404.1520(b).[2] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate

---

[2]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## II. BACKGROUND

Brad Jones protectively filed for SSI and DIB on January 25, 2011, alleging he became disabled on August 27, 2008. In his application for benefits, Jones alleged he was disabled due to back and leg pain. Jones was born on October 27, 1970, and was thirty-seven years old on the alleged disability onset date. Jones' applications were denied initially and upon reconsideration. Following the denial upon reconsideration, Jones requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A video hearing was held in Danville, Illinois, by ALJ Victoria Ferrer, who presided over the hearing from Orland Park, Illinois, on July 12, 2012. Jones was represented by counsel at the hearing. The ALJ issued her decision denying Jones' claims on September 13, 2012. On January 7, 2014, the Appeals Council denied review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner and subject to judicial review. Jones then filed this timely appeal.

*Medical Evidence*

Jones began having significant difficulty with his back on August 27, 2008, after an injury while bending over to pull carpet. He initially sought treatment with Dr. Clifford Hornbeck on September 2, 2008, for this lower back and buttock pain. Dr. Clifford diagnosed Jones with acute chronic back pain and recommended that Jones use a back brace at work, lift no

3

more than five pounds, and not bend or twist at the waist. On September 15, 2008, Jones underwent an MRI due to continued complaints of back pain. The MRI showed minimal disc bulge at L4-L5 with minimal compression of the L5 nerve root. Dr. Hornbeck began treatment, which included two epidural injections, in October 2008.

On November 21, 2008, Dr. John Gorup wrote a medical report in which he noted that Jones' pain had gradually worsened and had radiated into his legs. Dr. Gorup further reported that Jones had taken prescription medications, anti-inflammatories, epidural injections, physical therapy, and muscle relaxants, but they had all failed to completely resolve his pain. Dr. Gorup diagnosed Jones with internal disc disruption and disc herniation at L4-L5 and mechanical instability. Dr. Gorup also noted that Jones was a candidate for total disc replacement at L4-L5.

On January 13, 2009, Dr. Kenneth Renkens authored a medical report that indicated that Jones continued to complain of back pain and strain. He indicated that Jones had possible SI joint pain. Dr. Renkens ordered an MRI of Jones' lumbar spine on February 16, 2009, which indicated minimal spondylosis and disc dehydration. Dr. Renkens ordered physical therapy. By March 24, 2009, Dr. Renkens released Jones to work without restrictions. However, a month later Jones returned, informing Dr. Renkens that he had lost his job because he was unable to perform the work without restrictions. At this point, Dr. Renkens reported that Jones had met maximum medical improvement and placed him on a permanent partial impairment rating, restricting Jones to lifting twenty-five pounds frequently and fifty pounds occasionally. St. Clare Neighborhood Clinic wrote a follow-up report on June 19, 2009. This report showed a diagnosis of sciatica and herniated disc and stated that Jones could do no heavy lifting.

Also on June 19, 2009, Dr. Gorup stated in a report that, upon examination, his assessment was lumbar disc degeneration and acquired spondylolisthesis. On September 9, 2009,

Jones underwent treatment with Dr. Chetan Shulka, a pain management doctor. Jones indicated that he was in constant pain, and the pain worsened with sitting, standing, and walking. On September 23, 2009, and January 5, 2010, Jones underwent epidural injections.

Jones was referred to physical therapy treatment that began on August 31, 2009. Treatment was scheduled to last for eight weeks; Jones was discharged on November 3, 2009, because progress had plateaued.

Jones was examined on November 29, 2009, by Dr. James Cole for an orthopedic surgery evaluation. Dr. Cole ordered a CT scan of Jones' lumbar spine on January 11, 2010, which revealed Grade II internal disc derangement associated with bilateral posterolateral annular tears with shallow foraminal disc herniation. On February 2, 2010, Jones underwent L4-L5 decompression and fusion surgery. Upon discharge on February 4, 2010, Jones was diagnosed with lumbar spondylosis, low back pain, and degenerative lumbar disc disease. The discharge summary states that his pain was well controlled by oral narcotics. A follow-up report by Dr. Cole noted that Jones was receiving physical therapy and improving but that he had recently fallen and landed on his left leg. Since the fall, Jones had been complaining of low back pain and pain in the buttocks and medial thigh. Dr. Cole diagnosed Jones with spondylosis and instructed him to continue with physical therapy and use of the bone stimulator he had been prescribed.

On July 28, 2010, Jones underwent a CT scan which revealed no solid fusion. In an August 12, 2010, medical report, Dr. Coscia assessed Jones as having pseudoarthritic joints after fusion, low back pain, and spondylosis of the lumbar spine. On Jones' next visit to Dr. Coscia on August 27, 2010, Dr. Coscia stated that Jones felt dramatically better, was not having any muscle spasms or loss of function, and was ambulating well.

Jones underwent a functional capacity evaluation on September 3, 2010, which was reviewed by Dr. John McLimore, one of his treating physicians at OrthoIndy. Dr. McLimore deemed the results to be reliable with near maximal effort given during testing, but noted that the pain questionnaire scores indicated a strong tendency towards inappropriate illness type behaviors. Based on the evaluation, Dr. McLimore found that Jones had the following permanent restrictions:

> no lifting greater than 20 pounds floor to waist or 12 inch to waist height on an occasional basis, no lifting no greater than 35 pounds to shoulder height greater than 30 pounds on occasional basis, no lifting greater than 25 pounds from 40 inch to 74 inch on occasional basis, no carrying greater than 25 pounds on occasional basis, no push pull activities greater than 120 pounds on occasional basis, no repetitive bending, lifting or twisting.

Record at 603.

On September 7, 2010, Jones visited the emergency room complaining of acute pain following the functional capacity evaluation. The physical exam was normal and an x-ray of the spine was taken which revealed a normal spine other than status post fusion.

On January 16, 2011, Jones had a vocational rehabilitation assessment by Michael Blankenship, a non-physician. Mr. Blankenship reviewed two functional capacity evaluations. He stated that the results of the evaluations indicated that Jones would be able to sit from three to six hours per day, stand between three and six hours per day, and walk between three and six hours per day. Mr. Blankenship stated that the results of the evaluations were very different from the opinions of Jones. Mr. Blankenship opined that Jones could perform activities when he was feeling good, but not when he was feeling poorly. He concluded that Jones was not a candidate for employment.

On April 12, 2011, Dr. Sands, a State Agency physician, completed a residual functional capacity assessment on Jones. Dr. Sands opined that Jones could lift and carry twenty pounds

occasionally and ten pounds frequently, could sit for six hours in an eight-hour workday, could stand or walk for six hours in an eight-hour workday, could climb ramps and stairs, balance, stoop, kneel, crouch and crawl occasionally, but could never climb ladders, ropes, or scaffolds.

On March 21, 2012, Jones had an initial evaluation with Dr. Ungar-Sargon of Neurology and Pain Management. His assessment was lumbar syndrome and SI joint pain. Dr. Ungar-Sargon ordered an EMG that indicated that Jones had acute and chronic L5-S1 radiculopathy. A CT of the pelvis showed no acute intrapelvic process and post-operative changes at the lower spine with minimal disc bulge at L5-S1. Jones returned to Dr. Ungar-Sargon on April 5, 2012. The assessment was chronic pain syndrome, lumbar syndrome, radiculopathy and post fusion syndrome. On April 12, 2012, Jones returned for a sacroiliac injection. Jones returned to Dr. Ungar-Sargon on May 3, 2012, complaining that he was concerned about his upcoming disability case, medications, and filling out paperwork. He also stated he felt his back was getting worse. Dr. Ungar-Sargon's progress note states that the injection gave little help. There is no indication in the note whether Jones was taking pain medication at that time.

On May 3, 2012, Dr. Ungar-Sargon completed a form entitled Medical Source Statement Regarding Low Back Pain for Social Security Disability Claim. He stated that Jones suffered from severe post-fusion lumbar syndrome with radiculopathy. He reported that he found Jones had a neuro-anatomic distribution of pain, limitation of motion of the spine, a positive straight leg raise test, a need to change position more than once every two hours, and the inability to ambulate effectively. He opined that Jones could stand for fifteen minutes at a time and sit for fifteen minutes at a time; he could lift no amount of weight on an occasional or frequent basis; and he could never bend or stoop. He further opined that Jones would be absent more than four days per month for work as a result of his impairments or treatment. On the same day, Dr.

7

Ungar-Sargon signed a form entitled Medical Statement of Physical Abilities/Limitations for Social Security Disability Claim in which he opined that Jones could stand for only fifteen minutes at a time for a total of sixty minutes in an eight-hour work day, sit for only thirty minutes at a time for a total of sixty minutes in an eight-hour workday, lift no amount of weight frequently or occasionally, never bend, stoop, or balance, and only occasionally lift his arms over his shoulders or perform fine or gross manipulations with his hands. He further stated that Jones would be absent from work more than four days per month and that he would be off task more than sixty percent of the workday.

*Hearing Testimony*

At the hearing, Jones testified that he was disabled due to back pain. He testified that he lived in an apartment by himself and he had not worked since March 2009. He testified that he had tried taking pain medication, but when nothing seemed to work he had stopped taking pain medication entirely. He further testified that his pain was not controlled, remained constant, and seemed to be getting worse. He explained that he would have "flare ups" and the pain would move into his legs. Jones testified that he could only sit for a limited period of time and walk for a couple of blocks before the pain caused him to need to switch positions. Jones further testified that he usually took two naps per day. He reported that he occasionally did dishes, did laundry, vacuumed, mopped, and cleaned his shower. He further reported that he had custody of his kids in the summertime and would spend time with them; he also would occasionally visit an older couple who lived approximately five miles from him.

The ALJ also heard testimony from Vocational Expert ("VE") Randall Harding. The ALJ asked the VE to consider a hypothetical individual with Jones' age, education, and work experience who could "lift/carry 20 pounds occasionally, 10 frequently. Sit/stand/walk six hours

in an eight-hour workday. Occasionally push/pull 20 pounds, climb ramps and stairs, balance, stoop, kneel, crouch, crawl. Stand up to 20 minutes, sit up to 45 minutes continuously. Never climb ladders, ropes, scaffolds, be exposed to vibration." Record at 52. The VE testified that this hypothetical person could not perform Jones' past work, but could work as a clerical/addressing clerk or perform circuit board assembly or circuit board film touch-up. The ALJ then asked the VE to consider the same individual with the added requirement of missing an average of two days per month. The VE testified that this would eliminate all job positions.

### III.   THE ALJ'S DECISION

The ALJ determined at step one that Jones had not engaged in substantial gainful activity since August 27, 2008, the application date. At steps two and three, the ALJ concluded that Jones had the severe impairment of "status post lumbar fusion," *id.* at 13, but that his impairment did not meet or medically equal a listed impairment. At step four, the ALJ determined that Jones had the residual functional capacity ("RFC")

> to perform sedentary work . . . except [he] can lift and carry 20 pounds occasionally and 10 pounds frequently. [He] can stand and/or walk 6 hours in an 8-hour workday and sit six hours out of an 8-hour workday. Nevertheless, [he] can stand up to 20 minutes and sit up to 45 minutes, continuously. [He] can occasionally push and pull 20 pounds. [He] can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. [He] can occasionally stoop, balance, kneel, crouch and crawl and should not be exposed to vibration.

*Id.* at 14. The ALJ found that Jones was unable to perform any of his past relevant work, but that there were jobs that existed in significant numbers in the national economy that Jones could perform. Accordingly, the ALJ concluded that Jones was not disabled as defined by the Act.

### IV.   DISCUSSION

Jones presents two issues for the Court's review. First, he argues that the ALJ did not properly address the September 2010 opinion of Dr. McLimore, a treating physician, that Jones could not lift repetitively. Second, Jones argues that the ALJ did not properly evaluate the

9

opinion of Jones' treating pain management specialist Dr. Ungar-Sargon. Each argument will be addressed, in turn, below.

### A. Opinion of Dr. McLimore

Jones argues that the ALJ erred by failing to give the opinion of Dr. McLimore, one of his treating physicians, controlling weight, and specifically by not adopting Dr. McLimore's opinion that Jones could not perform repetitive lifting.

> A treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with substantial evidence in the record. If this opinion is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it. But once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and becomes just one more piece of evidence for the ALJ to consider.

*Bates v. Colvin*, 736 F.3d 1093, 1099-1100 (7th Cir. 2013) (internal quotation marks and citations omitted).

As noted above, Jones underwent a Functional Capacity Evaluation, the results of which was reviewed by Dr. McLimore in September 2010. Dr. McLimore deemed the test results reliable with near maximal effort given during testing. Based on the evaluation, Dr. McLimore opined that Jones had the following permanent restrictions:

> no lifting greater than 20 pounds floor to waist or 12 inch to waist height on an occasional basis, no lifting no greater than 35 pounds to shoulder height greater than 30 pounds on occasional basis, no lifting greater than 25 pounds from 40 inch to 74 inch on occasional basis, no carrying greater than 25 pounds on occasional basis, no push pull activities greater than 120 pounds on occasional basis, *no repetitive bending, lifting or twisting*.

Record at 603 (emphasis added). The ALJ assigned great weight to Dr. McLimore's opinion, noting the following:

> I have considered the opinion from Dr. John McLimore as to the claimant's limitations based on his treatment of the claimant and the testing at the functional capacity evaluation and give it great weight. Dr. McLimore's opinion is based on

> objective testing and his treatment of the claimant. The opinion is consistent with the overall record showing that the claimant is limited by his impairment and is unable to perform his past work, but is able to perform light work with additional limitations.

*Id.* at 21. The Court agrees with Jones that the ALJ erred by failing to address Dr. McLimore's opinion that Jones could not lift repetitively. It is not clear whether the ALJ rejected that portion of Dr. McLimore's opinion or whether she agreed with it but inadvertently failed to include it in her RFC and in her hypothetical questions to the vocation expert. If the former, this was error because the ALJ quite reasonably gave great weight to the opinion of Dr. McLimore in making her RFC determination, and therefore she could not reject the "no repetitive bending, lifting, or twisting" portion of that opinion without pointing to substantial contrary evidence in the record. If the latter, that, too was error; without the restriction being included in her hypothetical, it is impossible to know whether Jones actually can perform the jobs testified to by the vocational expert and adopted by the ALJ.

This case must be remanded so that the ALJ can explain whether she agrees with Dr. McLimore that Jones cannot perform repetitive lifting. If so, she should then determine what jobs Jones can perform with that added restriction. If not, she should explain why and point to substantial evidence of record on which she basis that determination.

### B. Opinion of Dr. Ungar-Sargon

Next, Jones argues that the ALJ's explanation of why she gave treating pain management specialist Dr. Ungar-Sargon's opinion little weight was inadequate. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's

opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

> In assigning little weight to Dr. Ungar-Sargon's opinion, the ALJ noted the following:
>
> I give this opinion by Dr. Ungar-Sargon little weight for several reasons. First, the two reports by Dr. Ungar-Sargon are inconsistent in terms of the sitting limitation. In the abilities/limitation report Dr. Ungar-Sargon states that [Jones] can sit at one time for 30 minutes, but in the statement regarding low back pain the doctor states that [he] can sit 15 minutes at one time. Secondly, the medical records, including Dr. Ungar-Sargon's own progress notes do not support such extreme limitations as stated in the report. For instance Dr. Ungar-Sargon opines that [Jones] can only occasionally perform fine and gross manipulation and raise the arms over the shoulder, yet his progress notes do not indicate any testing or findings regarding hand manipulations or of the upper extremities, despite the existence [of] check boxes for such findings to be reported. In fact, the only mention of manipulative or postural limitations other than straight leg raising at 60 is the report of [Jones'] complaints that pain is worse performing certain activities. Further, the overall medical records do not reflect manipulative limitations. Most importantly, at the hearing [Jones] testified that he could reach up and get groceries from the top shelves but had difficulty with objects on the bottom shelves due to bending, not due to an upper extremities limitation. Dr. Ungar-Sargon also opines that [Jones] is unable to ambulate effectively, yet there is no indication in his progress notes of any gait testing or observation or any need for an assistive device. Lastly, Dr. Ungar-Sargon was aware that [Jones] was not taking pain medication, yet he did not prescribe any. If [Jones'] pain was as extreme as opined by Dr. Ungar-Sargon, it is reasonable that he would have prescribed medication or least indicated the need to take over the counter medication.

Record at 20. While this is a thorough explanation of the ALJ's decision to afford Dr. Ungar-Sargon's opinion little weight, the Court agrees with one of Jones' criticisms of it—that the ALJ improperly "played doctor" when she opined that Dr. Ungar-Sargon would have prescribed pain medication if he thought Jones' pain was as bad as he concludes it was. The record is ambiguous whether Dr. Ungar-Sargon prescribed pain medication; Jones noted in a report that he prescribed hydrocodone on March 2012, but Dr. Ungar-Sargon's own notes are strangely silent as to medication. Perhaps Dr. Ungar-Sargon did, in fact, prescribe pain medication as Jones reported and that fact was omitted from his notes, or perhaps Dr. Ungar-Sargon decided to try other pain

12

management options instead of medication. Both of these possibilities are equally as plausible as the conclusion reached by the ALJ. In light of the ambiguity in the record, if the absence of a pain medication prescription by Dr. Ungar-Sargon was crucial to the ALJ's conclusion, the ALJ should have sought clarification from Dr. Ungar Sargon.

On remand, the ALJ should carefully consider all of the factors noted found in 20 C.F.R. § 404.1527(d)(2) in determining what weight she assigns to Dr. Ungar-Sargon's opinion. The ALJ should either seek clarification from Dr. Ungar-Sargon regarding whether he prescribed pain medication for Jones and, if not, why, or exclude that reason from her assessment of Dr. Ungar-Sargon's opinion.

## V. CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this entry.

SO ORDERED: 3/17/15

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.